UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:

Robert L. Bodack,                                    Case No. 06-41702
                                                     Chapter 7
             Debtor.                                 Hon. Phillip J. Shefferly
_____/

Arnold Herskovic, Arnold Herskovic IRA Rollover
Account, Arnold Herskovic, M.D., SC Defined Benefit
Plan and Trust, and All Other Arnold Herskovic
Retirement Entities,

             Plaintiffs,

vs.                                                  Adv. Proc. No. 06-4851

Robert L. Bodack,

             Defendant.
_____/

**OPINION (1) DENYING OBJECTIONS TO DISCHARGE
UNDER SECTIONS 727(a)(3) AND (4); (2) DENYING WITH PREJUDICE
THE REQUEST FOR DETERMINATION OF NON-DISCHARGEABILITY
OF DEBT UNDER SECTIONS 523(a)(2) AND (4); AND (3) DENYING
WITHOUT PREJUDICE THE REQUEST FOR DETERMINATION OF
NON-DISCHARGEABILITY OF DEBT UNDER SECTION 523(a)(19)**

I. Introduction

     Arnold Herskovic and a number of entities that he owns or controls brought this adversary

proceeding for the purpose of seeking a determination that the Debtor, Robert Bodack, is not entitled

to a discharge under § 727(a)(3) and (4) and to determine the non-dischargeability of debt under

§ 523(a)(2), (4), and (19). At trial, the Court heard testimony from two witnesses, Arnold Herskovic

and Robert Bodack, and received into evidence Plaintiffs' exhibits 1 through 20, Defendant's exhibits

A through I, and a portion of an unmarked deposition transcript from February 16, 2007. The Court

has reviewed all of the testimony and exhibits admitted into evidence. This Court has jurisdiction

pursuant to 28 U.S.C. §§ 1334(a) and 157(a). This is a core proceeding under 28 U.S.C. § 157(b)(2)(I) and (J). The Court concludes that judgment should be entered in favor of the Defendant and against the Plaintiffs on all counts in the complaint, except that the denial of the determination of non-dischargeability under § 523(a)(19) should be made without prejudice. The following constitutes this Court's findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052.

## II.  Facts

The Debtor was in the insurance business for over 35 years and involved in some form of insurance, investing, and financial planning since the 1970's. He has been an insurance agent, both for himself and for an entity known as Creative Retirement Plans, Inc. and, beginning in 2003, for its successor, Creative Retirement Plans, LLC. Since January, 2005, the Debtor has worked part time for a business owned by his wife, known as MEG Enterprises, Ltd., that provides insurance and securities related financial services. The Debtor holds a charter life underwriter license and a charter financial consultant license. This second license authorizes the Debtor to provide broad based insurance, estate planning, business planning and other financial planning services. The Debtor was also licensed to sell securities for over 20 years. However, in 1996, the National Association of Securities Dealers ("NASD") and the Securities and Exchange Commission ("SEC") revoked his securities license. The Debtor's explanation for the revocation was not clear. However, Ex. 10 is a May, 1996 report of Disciplinary and Other NASD Actions. It explains that the Debtor "was fined $910,000 and barred from association with any NASD member in any capacity. The sanctions were based on findings that [the Debtor] participated in private securities transactions while failing and neglecting to give prior written notice of, or obtain prior written authorization from, his member firm

-2-

to engage in such activities." After NASD and the SEC revoked his license to sell securities, the Debtor continued to sell insurance and engage in other estate planning, financial planning and business planning activities, but did not take any action to re-obtain a securities license.

Plaintiff Herskovic is a radiation oncologist. Sometime in 1993, the Debtor became acquainted with Herskovic, who was then the chief of staff at Oakwood Hospital. The Debtor was introduced to Herskovic by Charles Schiff. Schiff was an accountant for both the Debtor and for Herskovic, and was also the Debtor's friend. At that time, Herskovic was dissatisfied with a life insurance contract that he owned and, upon Schiff's recommendation, met with the Debtor to discuss other life insurance alternatives. In addition to Schiff recommending the Debtor to Herskovic, Herskovic's attorney, Robert Litt, also strongly recommended the Debtor to him. Initially, the Debtor's services for Herskovic pertained only to life insurance. Over time, they became quite friendly and the scope of the Debtor's services expanded. As the relationship grew, Herskovic requested that the Debtor assist him with his pension plan, personal investments, retirement planning, and various insurance matters. They met regularly until Herskovic moved his practice to Chicago, although they still spoke regularly after that. Their relationship was not spelled out in any document.

When Herskovic met the Debtor, Herskovic had a substantial salary and had assets at that time consisting of approximately $600,000 to $700,000 in a rollover from a pension plan, $400,000 in another plan from the time that he worked at Wayne State University, and somewhere between $250,000 and $500,000 of other assets. Although having substantial assets, Herskovic did not have expertise with regard to investments. Like many investors, he said that he wished to have the "maximum return" with as much "safety" as possible, but he says that "safety" was most important. During the course of their relationship, the Debtor explained to Herskovic his belief that the higher

-3-

the risk of an investment, the greater the return. At times, the Debtor drew illustrations for Herskovic purporting to show the correlation between risk and return (Ex. F).

The Debtor recommended a number of investments to Herskovic over time. According to Herskovic, the Debtor assured him that these investments were safe. Even as to those investments with a high rate of return, Herskovic says that he understood that there may be risks with respect to his return, but he never understood that there was any risk with respect to the recovery of his principal, and that he would not have made investments where the return of his principal was not safe. Herskovic explained that he took the Debtor's investment advice in part because he had received such strong recommendations about the Debtor from Schiff and Litt. Further, Herskovic admitted that he had neither the inclination nor the resources to conduct his own investigation regarding his investments.

Although the Debtor recommended investments, he testified that he had "zero discretionary power to move any of Herskovic's money." However, the Debtor admitted that on occasion he signed Herksovic's name to documents and then provided those documents to Herskovic after signing them, with yellow sticky notes attached advising Herskovic of the signature (Ex. 9). The record does not show that Herskovic ever objected to this practice because, as he explained, he trusted the Debtor and did not himself independently investigate any of his investments.

During the years that the Debtor provided investment advice, the Debtor did not tell Herskovic that the SEC and NASD had revoked his license to sell securities. The Debtor explained that he did not consider this fact relevant to his dealings with Herskovic because he was not selling securities to Herskovic. The Debtor contends that he did disclose his license revocation to Schiff, but there is no evidence that Schiff ever communicated this fact to Herskovic. Herskovic says he did

-4-

not know of the license revocation until he learned of that fact in this case. On the other hand, Herskovic did not testify that he ever understood that the Debtor was at one time licensed to sell securities, nor did he state whether he ever asked if the Debtor was so licensed. Herskovic did not testify that the Debtor ever said anything to him one way or the other about a license to sell securities. But he did say that if he had known that the Debtor's license had been revoked, he "would have considered" seeking advice from someone else regarding his investments.

Over the life of their relationship, Herskovic invested approximately $1,500,000 based on the Debtor's advice, not including insurance that he also purchased. Typically, the investments that the Debtor recommended to Herskovic had high "guaranteed" returns. According to the Debtor, these investments met Herskovic's desire to have as high a rate of return as possible. The Debtor received commissions on these investments. Of the total invested, the evidence showed that Herskovic's pension plan, the Arnold Herskovic, M.D., S.C. Defined Benefit Plan and Trust, invested over $400,000 and Herskovic individually invested over $1,000,000. The Debtor claims that none of these investments were securities, but rather were "biz opps," which is industry slang for investments known as "business opportunities." In his mind, he was free to sell them even though he has no license to sell securities.

Unfortunately, a number of the investments that the Debtor recommended to Herskovic turned out to be poor investments. Worse yet, some of these investments were subsequently adjudicated to be Ponzi schemes. In other instances, even though the Debtor claims that he did not need a license to sell a particular investment because it was a biz opp, the investment has since been determined by the SEC to be a security that could only be sold by a person with a securities license. The Debtor estimates that the value of all these investments today is "in the range of $250,000 to

$300,000."

     The parties stipulated to the admission of most of the exhibits. Although many of the exhibits pertained to specific investments that Herskovic made either individually or for his defined benefit plan, there is very little evidence of the actual investment transactions themselves, such as when they took place, or how they were accomplished. Several of the exhibits consisted of groups of documents. Many were not discussed in the testimony, so there is no explanation of their relevance or probative value. The exhibits included copies of various investment documents, including purchase agreements, lease agreements, and cash flow participation agreements. (See Exs. 12, 13, 14, 16, 17.) All of these agreements are between the specific investment entities and Herskovic, his defined benefit pension plan, or his IRA rollover account. The agreements are signed by Herskovic individually or as trustee of the pension plan or IRA rollover account. Some of the exhibits contain copies of checks written from the account of "Arnold Herskovic, M.D. SC," which were signed by Herskovic and made payable to the investment companies. (See Exs. G, 12, 14.)

     There was some testimony about Pension Consultants, Inc., which is an unrelated entity that set up and administered Herskovic's pension plan. Pension Consultants did not provide investment advice to Herskovic. The Debtor testified that he communicated with Pension Consultants, providing information that Pension Consultants then used in calculating the Minimum Funding Requirements for the year's contributions. (See Exs. 6, 7, A, B.) Herskovic himself was less than clear in his testimony, stating only that Pension Consultants was a company that sends him bills and letters regarding his tax returns.

     Two exhibits consist of facsimile communications from the Debtor to Pension Consultants. Ex. 6, dated June 2, 2004, purports to describe the investments held by Herskovic's defined benefit

plan as of December 31, 2003. Ex. 7, dated March 11, 2005, purports to describe the investments held by the defined benefit plan a year later, as of December 31, 2004. Each of these exhibits consists of a one-page "Fax Cover Sheet." The list of investments and ascribed dollar amounts from Ex. 6 appear in an attachment to a letter from Pension Consultants to Herskovic dated June 30, 2004 (Ex. A.) The attachment is a Statement of Assets and Liabilities as of December 31, 2003 for the defined benefit plan. The names of the investments and dollar amounts on the Statement of Assets are identical to the information in the June 2, 2004 facsimile from the Debtor to Pension Consultants. It is not clear from the record whether the amounts in Exs. 6 and 7 reflect the cost of the investments made by the defined benefit plan or the values of the investments on the dates indicated. No witness was called from Pension Consultants to explain Ex. A.

The Debtor testified about the investments listed in Exs. 6 and 7. The first investment is Midwest Telecom. The Debtor testified that he had been involved with a couple of entities that were engaged in the business of locating and installing payphones around the country. The Debtor suggested to Herskovic that he could form an entity to become engaged in this business locally in the Detroit metropolitan area. The Debtor formed Midwest Telecom in August 2002 for the purpose of finding locations and buying and installing payphones in those locations. On the Debtor's recommendation, Herskovic's defined benefit plan invested $105,000 in Midwest Telecom. The plan later invested another $75,000, which the Debtor first deposited in another entity that he owned, Michigan Venture Partners, and then later moved into Midwest Telecom. According to the Debtor, he also invested approximately $50,000 of his own money in Midwest Telecom and he personally provided the labor for the company. However, the Debtor admits that he did not tell Herskovic that Herskovic was the only investor in Midwest Telcom other than himself. Herskovic did not learn of

-7-

that fact until discovery in this case. Herskovic explained that, had he known this fact, he "would have been concerned about it," but he did not testify that he would not have made the investment. The Debtor testified that Midwest Telecom was "just getting to the break even point" when his relationship with Herskovic deteriorated in late 2005 after problems surfaced with a number of the other investments that Herskovic had made based upon the Debtor's advice. The Debtor testified that he then ceased the business operations of Midwest Telecom.

When asked if he had any records regarding Midwest Telecom, the Debtor replied "only a checking account record that can be obtained from Comerica." Ex. 4 is a letter from the Debtor addressed to Herskovic's attorney dated October 12, 2005. It states that "there is no paperwork from Midwest Telecom or the Michigan Venture Partners/Payphones Promotions Program." (The Debtor described Payphones Promotions as another one of his companies that he formed to provide marketing services to Midwest Telecom and Michigan Venture Partners for a fee.) The Debtor also testified that on December 23, 2005, he "resigned" from Midwest Telecom and sent a list of the payphones and their locations to Herskovic's attorney (Ex. 20). That letter purports to "relinquish control" of Midwest Telecom to Herskovic's attorney together with its remaining assets accompanied by a list of the payphones, their locations and telephone numbers. The Debtor testified that he sent two boxes along with this letter, containing some payphones and parts and a list of the phones and their locations.

The next investment on Exs. 6 and 7 suggested by the Debtor to Herskovic is a biz opp known as Constellation Networks. According to the Debtor, this entity was engaged in the business of reselling minutes of international telephone service for callers in the Middle East back to the United States. No evidence was adduced regarding the ownership of this entity. The testimony about the

amount of the investment was conflicting, ranging somewhere between $102,000 and $125,000. According to the Debtor, this entity is still operating but the Debtor has no idea what Herskovic's investment in it may be worth. There was no testimony elicited regarding the records of Constellation Networks or the Debtor's relationship to it.

The third investment on Exs. 6 and 7 recommended by the Debtor to Herskovic involved an entity known as Tax Lien Certificates or TLC. TLC was engaged in the business of purchasing tax lien certificates for properties subject to foreclosure sales. Herskovic's defined benefit plan invested $50,000 in TLC. In describing the structure of this investment, the Debtor testified that he explained to Herskovic that he would receive a 14% guaranteed return. The Debtor also identified a package of documents regarding TLC that he had provided to Herskovic (Ex. 14). The Debtor described Herskovic's relationship to TLC as a "pass through investment" in a "business opportunity." The Debtor testified that he was able to sell this investment vehicle because it was not a security that required a securities license to sell, but instead was a business opportunity, the sale of which is regulated by the Federal Trade Commission and not the SEC. However, the Debtor also acknowledged that the SEC subsequently took a contrary view when it determined that the sale of an investment in TLC was in fact the sale of a security and not the sale of a business opportunity. Ex. 15 is a copy of a receiver's report from a lawsuit filed by the SEC against TLC that describes many problems relating to TLC. The Debtor testified that he was unaware of any problems when he recommended the TLC investment to Herskovic. Herskovic's testimony was vague about when he first learned of any problems with TLC but he did recall that he had received about half of his principal back from this investment.

The fourth investment on Exs. 6 and 7 is National Payphone Corporation or NPC. On the

Debtor's recommendation, Herskovic's defined benefit plan also invested $49,000 in National Payphone Corporation (Ex. 13). National Payphone Corporation was not an entity owned or controlled by the Debtor. It was engaged in the business of finding locations and then buying and installing payphones in those locations. The Debtor also described this investment as a biz opp, and advised Herskovic that National Payphone Corporation was a "safe investment." National Payphone Corporation is now going through an SEC mandated liquidation, and the SEC has subsequently determined that this was not a biz opp, but was instead a security that required a license to sell. The Debtor believes that Herskovic's investment in National Payphone Corporation today is worth approximately 20-30% of his original investment.

Network Services Depot is another business opportunity investment that was made by the Herskovic's defined benefit plan on the Debtor's recommendation. The business concept for this entity involved the deployment of kiosks at hotels, airports and other public places to provide internet access. Herskovic's defined benefit plan invested $100,000. The current status of the investment is that it is "in litigation." The Debtor provided a convoluted explanation of his understanding of the litigation but acknowledged that he had "no reason to believe that the investment has any significant value." The Debtor further admitted that in Ex. 4, he stated that he could not locate any paperwork regarding Network Services Depot other than a copy of the lawsuit that he referenced.

The last investment from Exs. 6 and 7 that the Debtor testified about was Michigan Venture Partners or MVP. Herskovic's defined benefit plan invested $75,000 in Midwest Venture Partners on the Debtor's suggestion. The Debtor described this as a holding company that he had formed for the purpose of holding funds received from his clients that he would first put into Michigan Venture Partners and would then disburse out of the holding company into various biz opps such as National

-10-

Payphone Corporation, Network Services Depot and others. The Debtor testified that he "explained in passing" to Herskovic that he owned and controlled Michigan Venture Partners and was using it to disburse funds into other investments. The Debtor testified that approximately $200,000 to $300,000 of investments went into Michigan Venture Partners, including the $75,000 from Herskovic's defined benefit plan. The Debtor stated that Michigan Venture Partners did not keep records other than a checking account. His October 12, 2005 letter (Ex. 4) to Herskovic's lawyer also admitted that there was no "paperwork" regarding the marketing program of his company, Payphones/Programs, with Michigan Venture Partners.

Exs. 6 and 7 do not list any investments made by Herskovic individually. In contrast to the investments listed in those exhibits, all of which were made through Herskovic's defined benefit plan, Herskovic himself also personally invested approximately $1,000,000, upon the Debtor's advice, in yet another biz opp, Mobile Billboards. Mobile Billboards was described by the Debtor as a "successor/offering" of some sort that was created by the same individuals involved with National Payphone Corporation. The Debtor testified that he had a "comfort zone" with those individuals because, up to that point in time, National Payphone Corporation was paying all of its obligations. The business concept of Mobile Billboards involved mounting billboards on large trucks to generate advertising revenues. Herskovic testified that the Debtor told him this was a "good, safe investment with a high rate of return." The Debtor claims that he had reviewed projections of advertising revenues before rendering his advice, but the package of documents produced by the Debtor regarding Mobile Billboards (Ex. 17) does not contain any historical financial information regarding this business.

The Debtor admits that Mobile Billboards and National Payphones have now been found to

be Ponzi schemes. However, the documentary evidence in this record to demonstrate these findings is incomplete and somewhat disjointed. Ex. 18 includes a copy of a complaint for injunctive and other relief filed by the SEC against Mobile Billboards in the U.S. District Court for the Northern District of Georgia dated September 21, 2004. That exhibit also includes various other documents pertaining to that litigation, including a receiver's first interim report, which describes the business of Mobile Billboards in detail and includes various financial reports assembled by the receiver. Ex. 19 is an order entered by that same court on March 15, 2007, but in a separate lawsuit brought by a court-appointed receiver for Mobile Billboards. The complaint in this separate lawsuit is not in evidence. The Debtor is named as a defendant in this suit but, according to both Herskovic and the Debtor, the lawsuit has not proceeded against him individually because of his bankruptcy case. No party requested relief from the automatic stay to permit the case to proceed against the Debtor. However, the order entered in this case clearly explains not only the business of Mobile Billboards, but also the receiver's theory of liability against agents, like the Debtor, who sold investments in Mobile Billboards:

> The Receiver claims that the billboard investments sold by the sales agents were unregistered securities. The agents sold the alleged unregistered securities and received upwards of $10 million in commissions and bonuses from the sales even though they were not registered securities dealers. The Ponzi scheme was dependent upon the sales agents' efforts in soliciting investors.

(Ex. 19 at 23 (page 5 of March 15, 2007 Order).)

The district court's order in the lawsuit brought by the receiver extensively reviewed applicable case law for purposes of determining whether the investments in Mobile Billboards were securities within the meaning of federal securities law. The court held that they were: "The court thus finds that the transactions at issue in this case constituted the sales of investment contracts

-12-

subject to federal securities laws." (Ex. 19 at 26 (page 19 of March 15, 2007 Order).) The order went on to find that the agents who sold investments in Mobile Billboards had unlawfully sold securities and were therefore liable to disgorge any commissions or bonuses they may have received from such sales.

> Here, the court has determined that the mobile billboards constituted investment contracts covered by Sections 5(a) and 5(c) [of the Securities Act]. The defendants offered and sold the securities to the public although no registration statement was filed or in effect with respect to any of the securities. Accordingly, the defendants' sales or offers to sell the mobile billboard investments to investors violated the law, and any commissions or bonuses they received from such sales were thus received unjustly.

(Ex. 19 at 27 (page 23 of March 15, 2007 Order).)

There was no dispute at trial in this case that Mobile Billboards has been found to be a Ponzi scheme and that Herskovic's investment in it is worth little or nothing. The real area of dispute at trial concerned when the Debtor first learned of the problems with Mobile Billboards and when he first disclosed that information to Herskovic. Not surprisingly, the testimony differs. According to the Debtor, he first learned of the problems with Mobile Billboards in late 2004 and claims to have communicated these facts to Herskovic at that time. On the other hand, Herskovic testified that he did not learn from the Debtor any of the facts regarding Mobile Billboards or that it was a Ponzi scheme until his fiancée discovered those facts in 2005.

Even before learning of the demise of Mobile Billboards, Herskovic claims that the Debtor was misleading him as to the values of the various investments that he had made through his defined benefit plan. The Debtor counters that he provided Exs. 6 and 7, which listed the investments and dollar amounts, to Pension Consultant only for the purpose of showing the cost basis or adjusted cost basis of each of these investments. The Debtor insists that his intent was not to show the market

-13-

value of these investments at the time he provided this information. The face of Exs. 6 and 7 does not clearly reveal whether the information was intended to reflect market value or cost. However, Pension Consultants' report dated June 30, 2004 (Ex. A), incorporates the information provided by the Debtor to Pension Consultants in Ex. 6 and shows the value of Herskovic's investments as market value based on exactly the same numbers provided by the Debtor from Ex. 6. It appears that Pension Consultants used the Debtor's information to show the market value of Herskovic's investments, not the cost basis. Regardless of what the Debtor said that he was trying to portray in Exs. 6 and 7, Herskovic claims that he was misled by the Debtor with respect to the safety of these investments, relevant information about them, and their value. Until he learned that Mobile Billboards was a Ponzi scheme in 2005, Herskovic testified that he was unaware of any problems with any of the investments recommended by the Debtor, except for the TLC receivership.

After learning about the lawsuit against Midwest Billboards, and the receiver appointed over it, and realizing that the Mobile Billboards investment was essentially gone, Herskovic filed suit against the Debtor in Oakland County Circuit Court on November 22, 2005 (Ex. E). The status of that lawsuit is not part of the record. Herskovic did not know whether or not he had obtained a judgment in it against the Debtor.

### III. Discussion

The Debtor filed bankruptcy on February 15, 2006. Herskovic and the other Plaintiffs filed their complaint on June 30, 2006. The complaint raises two objections to discharge under §§ 727(a)(3) and (4). It also raises three requests for determination of non-dischargeability of debt under §§ 523(a)(2), (4) and (19).

-14-

Burden of Proof

Bankruptcy Rule 4005 states that "[a]t the trial on a complaint objecting to a discharge, the plaintiff has the burden of proving the objection." For objections to discharge, the standard of proof is a preponderance of the evidence. See Taunt v. Patrick (In re Patrick), 290 B.R. 306, 310 (Bankr. E. D. Mich.2003) (citing Barclays/American Business Credit, Inc. v. Adams (In re Adams), 31 F.3d 389, 393-94 (6th Cir.1994)). "[T]he rule of this circuit is that the right to a discharge in bankruptcy should be liberally construed." Newman v. Burnham (In re Newman), 126 F.2d 336, 337 (6th Cir. 1942) (citations omitted).

The standard of proof for exceptions to discharge under 11 U.S.C. § 523(a) is also "the ordinary preponderance-of-the-evidence standard." Grogan v. Garner, 498 U.S. 279, 291 (1991); Rembert v. AT&T Universal Card Services, Inc. (In re Rembert), 141 F.3d 277, 281 (6th Cir. 1998). "In order to except a debt from discharge, a creditor must prove each of these elements by a preponderance of the evidence. Further, exceptions to discharge are to be strictly construed against the creditor." Rembert v. AT&T Universal Card Services, Inc. (In re Rembert), 141 F.3d 277, 280-81 (6th Cir. 1998) (citing Longo v. McLaren (In re McLaren), 3 F.3d 958, 961 (6th Cir.1993)); Grogan v. Garner, 498 U.S. 279, 291 (1991); Manufacturer's Hanover Trust v. Ward (In re Ward ), 857 F.2d 1082, 1083 (6th Cir.1988)) (footnote omitted)).

Denial of Discharge Under § 727(a)(3)

Section 727(a)(3) provides for denial of discharge if "the debtor has . . . failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such . . . failure was justified under all the circumstances of the case . . . ."

-15-

> To sustain an objection to a discharge under § 727(a)(3), the proof must establish: (1) either that the debtor failed to keep or preserve any recorded information, including books, documents, records and papers, or that the debtor or someone acting for him destroyed, mutilated, falsified, or concealed any recorded information including books, documents, records and papers; and (2) that as a result, it is impossible to ascertain the financial condition and material business transactions of the debtor. The party seeking denial of a discharge has the burden of proving the inadequacy of the debtor's records. However, [o]nce a debtor's records are determined to be inadequate, the burden is on the debtor to establish any justification therefor.

Solomon v. Barman (In re Barman), 244 B.R. 896, 900 (Bankr. E.D. Mich. 2000) (internal quotation marks and citations omitted).

Virtually all of the evidence that came into the record regarding the Debtor's alleged failure to keep and preserve records pertained to two specific entities in which Herskovic had invested: Midwest Telecom and Michigan Venture Partners. Herskovic himself had no personal knowledge of the state of the Debtor's records, although the Debtor conceded that the only records for Midwest Telecom consisted of "a checking account record that can be obtained from Comerica" and that "there is no paper work from Midwest Telecom" relating to the "Partners/Payphones Promotion Program." The latter fact was admitted by the Debtor in Ex. 4. Some additional information regarding Midwest Telecom was sent by the Debtor to Herskovic's attorney in Ex. 20. The testimony regarding the records of Michigan Venture Partners was identical. The testimony and other evidence in the record is not probative of the state of the records regarding *the Debtor's* financial affairs. No evidence was adduced to establish that, as a result of the failure of Midwest Telecom and Michigan Venture Partners to maintain records, Herskovic is unable to ascertain the Debtor's financial condition and material business transactions.

The Court did not learn very much regarding the Debtor's practices concerning his own

-16-

books, documents and records. While there is some evidence in the record that suggests a general

lack of documentation regarding investments recommended by the Debtor to Herskovic, and some

evidence that Michigan Venture Partners and Midwest Telecom did not keep adequate business

records, on balance the Court is not persuaded that Herskovic has met his burden to prove that such

failures make it impossible to ascertain the Debtor's financial condition and material business

transactions. Therefore, the Court concludes that Herskovic's objection to discharge under

§ 727(a)(3) must be denied.

Denial of Discharge Under § 727(a)(4)

> In order to deny a debtor discharge under this section, a plaintiff must prove
> by a preponderance of the evidence that: 1) the debtor made a statement under oath;
> 2) the statement was false; 3) the debtor knew the statement was false; 4) the debtor
> made the statement with fraudulent intent; and 5) the statement related materially to
> the bankruptcy case. Whether a debtor has made a false oath under section
> 727(a)(4)(A) is a question of fact.

Keeney v. Smith (In re Keeney), 227 F.3d 679, 685 (6th Cir. 2000) (internal quotation marks and

citation omitted).

> Under this section, a fraudulent statement must be made with a knowing intent
> to defraud creditors. Deliberate omissions from the schedules may constitute false
> oaths and result in the denial of a discharge. The plaintiff must demonstrate actual,
> not constructive, fraud. However, since defendants will rarely admit their fraudulent
> intent, actual intent may be inferred from circumstantial evidence. A series or pattern
> of errors or omissions may have a cumulative effect giving rise to an inference of an
> intent to deceive. On the other hand, the discharge is not to be denied when the
> untruth was the result of a mistake or inadvertence.

Stevenson v. Cutler (In re Cutler), 291 B.R. 718, 726 (Bankr. E.D. Mich. 2003) (internal quotation

marks and citations omitted).

Herskovic testified that he did not have any knowledge of the existence of any false statement

made under oath by the Debtor. But Herskovic did introduce some evidence of at least two potential

false oaths by the Debtor. First, the Debtor acknowledged his failure to list on his schedules of liabilities in his bankruptcy case the fine of $910,000 he received from the SEC when his securities license was revoked in 1996. Second, in his answer to question No. 19 on his statement of financial affairs (Ex. 1), the Debtor indicated that his accountant, Schiff, had provided services as an accountant to him "for last two years," when in fact he did not provide any services to the Debtor in the year immediately prior to the bankruptcy case.

With respect to the failure to list the $910,000 fine, the Debtor testified that this was an innocent omission and that he disclosed the fact of the fine at the § 341 meeting and then promptly amended his schedules to list this as a debt. A review of the Court file reflects that the Debtor did promptly amend his schedules to show the $910,000 debt. There is no evidence in the record to controvert the Debtor's assertion that this was an inadvertent omission that was not done knowingly or fraudulently.

With respect to the second potential false oath, the Debtor testified that in fact Schiff did not provide him with services during the year immediately preceding his bankruptcy petition because his services had terminated at the end of 2004, but that Schiff did perform services within the two years before the bankruptcy case and that is what the Debtor was intending to disclose. The Debtor explained that if his answer to question No. 19 on the statement of financial affairs was not technically accurate in all respects, he did not intend to incorrectly answer the question. The Court finds that any inaccuracy in answering this question is not a sufficient false oath for purposes of § 727(a)(4) because first, there is no evidence in the record that it was knowingly and fraudulently made, and second, the statement does not relate materially to this bankruptcy case. For those reasons, at the close of Herskovic's proofs, the Court granted the Debtor's motion to dismiss the § 727(a)(4)

-18-

objection.

<u>Non-Dischargeability Under § 523(a)(2)(A)</u>

In order to except a debt from discharge under § 523(a)(2)(A), a creditor must prove the following elements: (1) the debtor obtained money[, property, services, or credit; (2)] through a material misrepresentation[; (3)] that, at the time, the debtor knew was false or made with gross recklessness as to its truth; [(4)] the debtor intended to deceive the creditor; [(5)] the creditor justifiably relied on the false representation; and [(6)] its reliance was the proximate cause of loss. In order to except a debt from discharge, a creditor must prove each of these elements by a preponderance of the evidence. Further, exceptions to discharge are to be strictly construed against the creditor.

<u>Rembert v. AT&T Universal Card Services, Inc.</u> (<u>In re Rembert</u>), 141 F.3d 277, 280-81 (6th Cir.

1998) (citations omitted).

Before reviewing the specific elements that make a debt non-dischargeable under § 523(a)(2)(A), as a threshold matter, the Court must first consider whether any evidence has been introduced to show the existence of a debt. The Debtor's schedules in his bankruptcy case (Ex. 2) show that the Debtor listed Herskovic and his defined benefit plan as holding a disputed claim of $1,500,000 and listed Herskovic's "retirement plan" as holding an undisputed claim of $1,516,000. In contrast, the evidence at trial showed that it was Herskovic and his defined benefit plan that made the investments. No evidence was adduced at trial to show that any investments were made by any entity other than Herskovic or his defined benefit plan. To say that the testimony regarding the actual investments was imprecise by both witnesses is an understatement. In any event, by agreement of the parties at the commencement of trial, no evidence was presented to enable the Court to liquidate the amount of any debt to Herskovic, his defined benefit plan or any other entities. The parties specifically requested that the Court not adjudicate the amount of any debt at the trial. Throughout the course of the trial the parties appeared to agree, and proceeded on the premise, that there is a debt

-19-

owing by the Debtor in some combination to Herskovic and his defined benefit plan, and that it consists of some or all of the loss of value of Herskovic's aggregate investments individually and through the defined benefit plan, from $1,500,000 down to their present value today, which is estimated even by the Debtor to be at most $200,000 to $300,000. Based on the Debtor's testimony, his admission of an undisputed debt on his schedules (Ex. 2), the apparent agreement of the parties at trial, and the uncontroverted testimony of both witnesses that Herskovic invested approximately $1,000,000 and his defined benefit plan invested approximately $400,000, the Court finds that there is a debt owing by the Debtor to Herskovic and his defined benefit plan. Consistent with the parties' request, the Court makes no finding as to the amount of the debt. The Court further finds that Herskovic failed to prove the existence of a debt owed to the Arnold Herskovic IRA Rollover Account, or any of the "other Arnold Herskovic retirement entities" that are named as Plaintiffs in the complaint. Therefore, it is unnecessary to consider the elements of § 523(a)(2)(A) for any Plaintiff other than Herskovic individually and his defined benefit plan. To the extent that a § 523(a)(2)(A) request to determine non-dischargeability is brought by the other Plaintiffs, it must be dismissed for failure of proof.

Having found that there is a debt, the first element of § 523(a)(2)(A) is whether the Debtor obtained money or property. With respect to Herskovic and the defined benefit plan, the Court is convinced that this element is met based on the Debtor's admission that he obtained money in the form of the commissions that he received upon Herskovic and his defined benefit plan making the suggested investments.

The second element of § 523(a)(2)(A) is that there has been a material misrepresentation. In this case, Herskovic and the defined benefit plan point to at least six material misrepresentations

shown by the evidence.  The Court will examine each of them and, in those instances where a material

misrepresentation has been shown, will then proceed to consider whether the evidence demonstrates

the presence of the other elements of § 523(a)(2)(A) with respect to such material misrepresentation.

The first possible material misrepresentation consists of the Debtor's failure to disclose that

his securities license had been revoked.  The evidence establishes that the Debtor lost his securities

license in 1996 and did not disclose that fact to Herskovic.  However, there is no evidence that the

Debtor told Herskovic that he was licensed.  Nor was there was any testimony by Herskovic that he

ever inquired about whether the Debtor had a securities license or had any understanding one way

or the other.  But even if the Court concludes that the Debtor's failure to affirmatively inform

Herskovic about the license revocation constitutes a material misrepresentation, that the Debtor knew

was false and that was intended to deceive Herskovic, there is another element of § 523(a)(2)(A) that

is simply not present with respect to this possible material misrepresentation, and that is the element

of justifiable reliance.

> [A] person is justified in relying on a representation of fact although he might
> have ascertained the falsity of the representation had he made an investigation. . . .
> although the plaintiff's reliance on the misrepresentation must be justifiable . . . this
> does not mean that his conduct must conform to the standard of the reasonable man.
> Justification is a matter of the qualities and characteristics of the particular plaintiff,
> and the circumstances of the particular case, rather than of the application of a
> community standard of conduct to all cases.  Justifiability is not without some limits,
> however. . . . [A] person is required to use his senses, and cannot recover if he blindly
> relies upon a misrepresentation the falsity of which would be patent to him if he had
> utilized his opportunity to make a cursory examination or investigation. . . . [I]t is
> only where, under the circumstances, the facts would be apparent to one of
> [plaintiff's] knowledge and intelligence from a cursory glance, or he has discovered
> something which should serve as a warning that he is being deceived, that he is
> required to make an investigation of his own.

Field v. Mans, 516 U.S. 59, 70-71 (1995) (internal quotation marks and citations omitted).

At trial, Herskovic provided no testimony that he ever relied in any manner upon the Debtor having a securities license when he sought the Debtor's advice with respect to his investments. He did not know and did not inquire whether the Debtor had a securities license. In fact, when asked what he would have done had he known such fact, Herskovic was unsure that he would have done anything differently and stated only that he may have considered seeking other financial advice. It is unnecessary to consider the other elements of § 523(a)(2)(A) and their application to the Debtor's failure to disclose the license revocation because the record does not provide the Court with any evidence that Herskovic relied in any way upon the Debtor holding a securities license.

The second potential material misrepresentation consists of the Debtor's assurances that the investments he recommended were "safe investments" with "guaranteed returns," in the sense that there was no risk to the principal amounts invested. These statements certainly were material statements that turned out not to be true. But what evidence is there that the Debtor knew that these statements were falsely made? There was no direct evidence put forth to show that the Debtor knew that any of the assurances he gave Herskovic regarding suggested investments were false. Herskovic relies primarily on the fact that the Debtor was in the insurance and financial planning business for many years and was well educated and possessed years of experience, all of which should have indicated to the Debtor that his statements regarding the safety of these investments were not true. Herskovic's theory seems to be that, with all of his years of experience, the Debtor should have known that the investments he was recommending were not safe and were not guaranteed. But even if the Court concludes that the Debtor's experience alone was sufficient to find that he should have known that his assurances regarding these investments were false, or that they were made with gross recklessness as to their truth, the Court is unpersuaded after listening to all of the evidence that the

Debtor intended these assurances to deceive Herskovic. While the Debtor may not have conducted sufficient diligence in investigating each of these investments to provide the advice that he gave, and in that respect may have been negligent of his duties, those facts do not by themselves demonstrate on this record an intent to deceive Herskovic. The record shows that Herskovic and the Debtor had a long standing relationship with many investments, some of which provided a return and others of which unfortunately ended badly. The evidence is insufficient to prove that the Debtor intended to deceive Herskovic.

Further, even if the Court were to find that the Debtor intended to deceive Herskovic by his assurances about these investments, Herskovic's own testimony again belies a finding that he justifiably relied upon these assurances. Herskovic's testimony left the Court with the firm impression that he was relying on Schiff and Litt's "strong recommendation" regarding the Debtor, rather than any specific assurances from the Debtor concerning any specific investments. In his deposition testimony, Herskovic agreed with the characterization that his investment decisions were made by a "committee" of Schiff, Litt and the Debtor (unmarked Ex., Tr. Feb. 16, 2007 at 10, lines 2-17). At trial, Herskovic testified that "they" knew "a lot" more than he did about investing. He clarified that "they" were Schiff and Litt, but mostly Schiff. Herskovic further explained that he did not have the time or inclination to look into any of his specific investments although he admitted that he was looking for as a high a rate of return as possible. While the Debtor seems to have had a propensity to recommend investments with high rates of return and high risks, the testimony of the witnesses again does not convince the Court that there was any justifiable reliance by Herskovic on any of the Debtor's statements regarding specific investments, but instead leaves the impression that Herskovic deliberately distanced himself from information regarding specific investments.

-23-

The facts in this case are similar to those in <u>Krist v. Curtis</u> (<u>In re Curtis</u>), 345 B.R. 870 (Bankr. N.D. Ill. 2006). The plaintiff in that case held an undergraduate degree. <u>Id.</u> at 871. The defendant had almost 30 years of experience in the "financial services arena and other businesses," including insurance. <u>Id.</u> He also was licensed by NASD to sell securities. The plaintiff "executed a special power of attorney," authorizing the defendant to invest $100,000 from the plaintiff's IRA. <u>Id.</u> at 872. The plaintiff received only $32,500 of that investment back. <u>Id.</u> at 874. After the defendant filed for bankruptcy, the plaintiff filed a complaint under § 523(a)(2)(A). "The pivotal question in this case [was] whether [the plaintiff] was justified in relying on [the defendant]'s representations." <u>Id.</u> at 875. The court first distinguished reasonable reliance from justifiable reliance. "'Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases.'" <u>Id.</u> (quoting <u>Field v. Mans</u>, 516 U.S. 59, 70 (1995)). In applying that test to the facts of the case, the <u>Krist</u> court found that, as a college-educated person, the plaintiff

> was not justified in relying on representations of [the defendant] that he would earn a 2080% profit on his money in one year. [The plaintiff] did not have to conduct an investigation to have ascertained the falsity of [the defendant]'s representations. There was only one place that such returns could have come from and that was from the pockets of persons gullible enough to join in what amounts to a Ponzi scheme. If [the plaintiff] really believed that this "program" was legitimate, he would have requested the advice of legal or financial counsel before he put every dime he had into it. By failing to examine the investment at all, he assumed the risk.

<u>Id.</u> at 875.

Similarly, Herskovic made no effort to even make a cursory examination of the suggested investments. Instead he blindly trusted the people he was told he could trust. Even at trial, although he seemed honest in his testimony, Herskovic, a very highly educated professional, still remained

ignorant of even the most basic facts regarding his investments. This is not justifiable reliance.

The third potential material misrepresentation consists of the Debtor's failure to disclose the fact that he was operating Midwest Telecom himself and that there were no other individuals involved as investors other than Herskovic. Again, however, there is no evidence that Herskovic ever inquired as to whether there were other investors or inquired about the business operations at Midwest Telecom. Much like the other evidence of generalized assurances concerning high rates of return and safe investments, it appears that Herskovic was content to simply invest large sums of money on the Debtor's suggestion without asking for any information about the investments. Further, when asked at trial if he would have done anything differently had he known that Midwest Telecom had no investors other than himself and that the Debtor was providing the labor, Herskovic responded "I don't know. I would have been concerned about it." Even assuming that the failure of the Debtor to affirmatively step forward with information about these investments constitutes a material misrepresentation that was made with intent to deceive, there is nothing in the record that establishes that there was any justifiable reliance by Herskovic.

The fourth potential material misrepresentation consists of the Debtor's failure to disclose that Michigan Venture Partners was his holding company for the purpose of making disbursements. The analysis here is the same as with respect to the information that came out at trial regarding Midwest Telecom. Herskovic did not ask for any information about these entities and was not told any information about them, so it makes it difficult to argue that he somehow justifiably relied upon any representations made by the Debtor about them. Unfortunately, it appears that Herskovic blindly followed investment advice from the Debtor that turned out to be very bad advice.

The fifth potential material misrepresentation is the Debtor's failure to disclose that Mobile

Billboards was a Ponzi scheme. All of the testimony regarding this alleged misrepresentation concerned whether the Debtor disclosed the problems with Mobile Billboards after the fact in late 2004 or early 2005. The Debtor says that he told Herskovic about the problems with Mobile Billboards as soon as he learned about the lawsuit and learned that it was a Ponzi scheme in the fall of 2004. Herskovic says that the Debtor did not come forward with this information and that he learned it only through his fiancée conducting research on the internet and that the Debtor only acknowledged Mobile Billboards' problems when Herskovic confronted him in 2005. What this testimony all misses is the fact that Herskovic's investment in Mobile Billboards was made before the time that Mobile Billboards was determined to be a Ponzi scheme. Even if the Court disregards entirely the Debtor's testimony regarding when he disclosed Mobile Billboards' problems to Herskovic, and instead accepts all of Herskovic's testimony regarding the timing of the disclosure, the evidence does not show that Herskovic took any action in reliance. In other words, by either Herskovic's or the Debtor's account as to when the problems were first revealed, all of Herskovic's $1,000,000 was already invested in Mobile Billboards. No evidence was adduced in the record to show any material misrepresentations by the Debtor about Mobile Billboards that were made *before* Herskovic made his investment in Mobile Billboards. The only evidence in the record regarding any discussions about Mobile Billboards before the million dollars was lost was very generalized testimony concerning assurances of high returns and safety of investments. While Herskovic's losses are substantial and unfortunate, the Court cannot find on this record that there were material misrepresentations made about Mobile Billboards by the Debtor to Herskovic that were known to be false when made and that Herskovic justifiably relied upon either in making the investment or in taking some other action.

-26-

Finally, the last potential material misrepresentation was the Debtor's failure to disclose that the biz opps were really securities that required a securities license to sell. There was substantial evidence to show that TLC and Mobile Billboards were determined by the SEC to be securities for which a license was required, and not biz opps which could be sold without a license. But all of this evidence shows that these determinations were made after the Debtor had advised Herskovic to invest in these biz opps. The Debtor's testimony is that the SEC made these determinations after the fact and that he had no knowledge or any reason to believe that these biz opps would be determined by the SEC to be securities for which a license is required. There was no contradictory testimony or documentary evidence to show that the Debtor somehow knew that these biz opps would later be determined by the SEC to be securities that he was not licensed to sell. Herksovic urges the Court to find that the Debtor's experience in the financial planning industry by itself is sufficient to prove that the Debtor must have known that these biz opps would later be adjudicated to be securities. But there is no evidence in the record to show that there had been any prior SEC litigation over these types of investments or that the Debtor had any knowledge either of prior similar lawsuits or even any indications from the SEC that it intended to treat these biz opps as securities. The Court cannot find in this record that Herskovic proved that the Debtor made material misrepresentations with knowledge of their falsity, with intent to deceive Herskovic, or that Herskovic justifiably relied upon them.

It appears to the Court that the investments made by Herskovic were high risk investments that eventually tanked. The Debtor gave some very bad investment advice to Herskovic that has resulted in catastrophic losses, but that does not necessarily give rise to a non-dischargeable debt under § 523(a)(2)(A). There is ample testimony that Herskovic was seeking as high a rate of return

-27-

as possible. There is likewise ample evidence that he essentially let the Debtor make these investment decisions for him along with some generalized recommendations from the "committee" of Schiff and Litt. It is uncontroverted that Herskovic did not have the interest, inclination, or the resources to look at individual investments, and that he wanted to be free from having to make investment decisions. That he would end up in some very bad investments was due in part to his own abdication of responsibility concerning the investments. Herskovic is understandably angry that these investments have turned out to be very high risk, poor investment decisions that have cost him a lot of money. Yet Herskovic provided the Court with no evidence of any specific statements that were made to induce him to make these investments before they were made that turned out to have been false and that were shown to have been known to be false by the Debtor and justifiably relied upon by Herskovic when they were made. Most of the testimony concerning possible material misrepresentations pertained to after the fact disclosures of problems that came to light with these investments. Substantial time was expended debating the meaning of Exs. 6 and 7. But whether these exhibits were intended to portray Herskovic's cost in the investments or the value of the investments at the time of the exhibits is not probative of what statements, if any, were made to induce Herskovic to make the investments or that he relied upon in these investment decisions. Further, even if Herskovic is right that the Debtor was intending to misrepresent the values of the defined benefit plan on Exs. 6 and 7, there is no evidence in the record to show that Herskovic ever took any action in reliance upon the figures set forth in those exhibits. After carefully reviewing all of the testimony in the record, the Court remains unpersuaded that Herskovic has proven each of the elements of § 523(a)(2)(A) by a preponderance of the evidence. The request to determine non-dischargeability under § 523(a)(2)(A) must be denied.

<u>Non-Dischargeability Under § 523(a)(4)</u>

Section 523(a)(4) excepts from discharge a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny . . . ." The Sixth Circuit has held that § 523(a)(4) "requires: 1) a fiduciary relationship; 2) breach of that fiduciary relationship; and 3) a resulting loss." <u>R.E. America, Inc. v. Garver</u> (<u>In re Garver</u>), 116 F.3d 176, 178 (6th Cir. 1997). The Sixth Circuit has taken a narrow view of "fiduciary capacity" under § 523(a)(4), and requires "the existence of an express or technical trust relationship." <u>R.E. American, Inc. v. Garver</u> (<u>In re Garver</u>), 116 F.3d 176, 179 (6th Cir. 1997); <u>see also</u> <u>In re Johnson</u>, 691 F.2d 249, 251-52 (6th Cir. 1982) (finding that fiduciary capacity "applies only to express or technical trusts and does not extend to implied trusts, which are imposed on transactions by operation of law as a matter of equity" and "the requisite trust relationship must exist prior to the act creating the debt and without reference to it") (citations omitted). "To establish the existence of an express or technical trust, a creditor must demonstrate: '(1) an intent to create a trust; (2) a trustee; (3) a trust res; and (4) a definite beneficiary.'" <u>Board of Trustees of Ohio Carpenters' Pension Fund v. Bucci</u> (<u>In re Bucci</u>), No. 06-4164, 2007 WL 1891736 at *3 (6th Cir. July 3, 2007) (quoting <u>Commonwealth Land Title Co. v. Blaszak</u> (<u>In re Blaszak</u>), 397 F.3d 386, 391-92 (6th Cir. 2005)).

Herskovic did not introduce any evidence of an express or technical trust. The evidence establishes that Herskovic sought and obtained investment advice from the Debtor. No testimony was elicited to show an intention to create a trust or the existence of a trust res. Nor was any authority provided to the Court to enable to the Court to conclude that the relationship of the Debtor to Herskovic rises to the level of a fiduciary relationship. The Court finds that none of the elements of § 523(a)(4) are present and the request to determine a non-dischargeable debt under § 523(a)(4)

must be denied.

Non-Dischargeability Under § 523(a)(19)

Section 523(a)(19) excepts from discharge a debt that

> (A) is for –
>      (i) the violation of any of the Federal Securities laws . . . , any of the State securities laws, or any regulation or order issued under such Federal or State securities laws; or
>      (ii) common law fraud, deceit, or manipulation in connection with the purchase or sale of any security; and
> (B) results, before, on, or after the date on which the petition was filed, from –
>      (i) any judgment, order, consent order, or decree entered in any Federal or State judicial or administrative proceeding;
>      (ii) any settlement agreement entered into by the debtor; or
>      (iii) any court or administrative order for any damages, fine, penalty, citation, restitutionary payment, disgorgement payment, attorney fee, cost, or other payment owed by the debtor.

11 U.S.C. § 523(a)(19).

Section 523(a)(19) was added to the Bankruptcy Code as an exception to discharge by the Corporate and Criminal Fraud Accountability Act of 2002. The Court in Frost v. Civiello (In re Civiello), 348 B.R. 449 (Bankr. N.D. Ohio 2006) observed that the legislative history shows the purpose of this section is to protect investors:

> Current bankruptcy law may permit such wrongdoers to discharge their obligations under court judgments or settlements based on securities fraud and other securities violations. This loophole in the law should be closed to help defrauded investors recoup their losses and to hold accountable those who violate securities laws after a government unit or private suit results in a judgment or settlement against the wrongdoer.

Id. at 463 (internal quotation marks and citations omitted).

The Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA") amended § 523(a)(19) in one important respect. Prior to BAPCPA, § 523(a)(19) arguably required that the

-30-

judgment, order, consent order or decree which results in the debt must have been entered in a judicial or administrative proceeding prior to the filing of the debtor's bankruptcy case. BAPCPA added language in § 523(a)(19)(B) that makes it clear that the judgment, order, consent order or decree that results in the debt may be entered "before, on, or after the date on which the petition was filed." This amendment eliminates any requirement that there be a pre-bankruptcy adjudication on which a § 523(a)(19) action must be based.

It is also important to note in considering this exception to discharge that there is no requirement in the Bankruptcy Code that a creditor must ever file an adversary proceeding in order to except a debt from discharge under § 523(a)(19). Section 523(c)(1) provides that debt of a kind specified in § 523(a)(2), (4) or (6) is only excepted from discharge if the creditor to whom such debt is owed has sought and obtained a timely determination that such debt is to be excepted from discharge under one of those sections. Failure to obtain a judicial determination in those instances results in discharge of the debt even if the debt is otherwise of the kind specified in § 523(a)(2), (4) or (6). On the other hand, § 523(c)(1) does not require a creditor to file an adversary proceeding to obtain a judicial determination whether a debt is of the kind specified in § 523(a)(19) in order and except it from discharge. In other words, a debt of a kind specified in § 523(a)(19) is not discharged irrespective of whether the holder of that debt requests and obtains a determination of such non-dischargeability by the Bankruptcy Court. See Idaho Dept. of Finance v. McClung (In re McClung), 304 B.R. 419, 424 (Bankr. D. Idaho 2004) (Section "523(c)(1) does not apply to proceedings to determine the dischargeability of debts under § 523(a)(19). While [a creditor] may do so, there is no prerequisite that a creditor seek a determination from the bankruptcy court that a debt is nondischargeable as a condition of collecting a debt excepted from discharge under this provision.").

To render a debt non-dischargeable under § 523(a)(19), Herskovic must demonstrate under § 523(a)(19)(A) that the debt is for violation of state or federal securities laws or for common law fraud, deceit or manipulation in connection with the purchase or sale of any security, **and**, under § 523(a)(19)(B), that the debt results from a judgment, order, consent order, or decree entered in a federal or state judicial administrative proceeding, a settlement agreement entered into by the Debtor, or for damages, fines, penalties or other payments owed by the Debtor.

In this case, Herskovic alleges the existence of a non-dischargeable debt under § 523(a)(19)(A)(i) because the Debtor violated federal securities laws when he sold securities without a license. Herskovic elicited a fair amount of testimony from the Debtor acknowledging that certain of the biz opps in which Herskovic invested have subsequently been alleged to be, and in some cases found to be, securities. However, Herskovic introduced no evidence of any settlement agreement entered into by the Debtor or any court or administrative order requiring the Debtor to pay damages, fines or other payments to Herskovic. The only evidence in the record that there has ever been any "judgment, order, consent order, or decree entered in any federal or state judicial or administrative proceeding" consists of the order entered by the U.S. District Court for the Northern District of Georgia on March 15, 2007 in the action brought by the receiver of Mobile Billboards against various individual defendants who served as agents in connection with the sale of investments in Mobile Billboards (Ex. 19). That order unequivocally held that the sales of investments in Mobile Billboards constituted the sale of unregistered securities and the court concluded that there was a violation of §§ 5(a) and (c) of the Federal Securities Act. However, there are still two issues that require resolution before this Court can hold that this order can provide the basis for a determination of non-dischargeability under § 523(a)(19).

-32-

The first issue is whether or not the order entered by the U.S. District Court is binding upon the Debtor. The Debtor was named as a defendant in that lawsuit. The U.S. District Court entered the order on March 15, 2007, after the Debtor filed his chapter 7 petition on February 15, 2006. The lawsuit was stayed against the Debtor as of the petition date, and the stay was not lifted. There is no evidence in the record, nor did the parties provide the Court with any legal authority, that addresses whether the order is binding on the Debtor. Second, even if the Court were to conclude that the order of the U.S. District Court is binding upon the Debtor, a more serious question is whether that order finding a violation of federal securities laws "results" in the "debt" to Herskovic. The U.S. District Court entered the order in an action not brought by investors in Mobile Billboards, but rather by the receiver for Mobile Billboards, for the purpose of compelling agents who sold investments in Mobile Billboards, like the Debtor, to disgorge the commissions and bonuses they received by reason of the sale of these unlicensed securities. The order establishes the liability of such agents to repay such commissions and bonuses back to the receiver for the benefit of all of the creditors of Mobile Billboards. But the order does not impose any liability in favor of investors, such as Herskovic, who purchased the unlicensed securities for all or a portion of the amounts they invested.

Although the order of the U.S. District Court contained in Ex. 19 clearly adjudicates a violation of federal securities laws, and was entered in a federal judicial proceeding, the Court cannot conclude from the record before it that the debt owed by the Debtor to Herskovic "results from" the order of the U.S. District Court on March 15, 2007. Contra Frost v. Civiello (In re Civiello), 348 B.R. 459, 466-67 (Bankr. N.D. Ohio 2006) (finding that a non-dischargeable § 523(a)(19) debt "resulted from" a cease and desist order entered by a state court for a violation of Ohio securities law because the statute the debtor was found to have violated provides that the seller of securities shall

-33-

be liable "for the full amount paid by the purchaser and for all taxable court costs").

The Court therefore holds that Herskovic has not proven the existence of a non-dischargeable debt under § 523(a)(19) in this adversary proceeding. However, that is not to say that Herskovic cannot ever prove the existence of a non-dischargeable debt under § 523(a)(19). BAPCPA's amendment to this section makes it clear that the "judgment, order, consent order or decree" finding the securities law violation can be entered in a federal or state judicial or administrative proceeding "before, on or after the date on which the petition is filed." Because a "judgment, order, consent order or decree" may be entered at some time in the future, the Court concludes that the appropriate disposition of Herskovic's § 523(a)(19) count is to dismiss it without prejudice. If a "judgment, order, consent order or decree" is subsequently entered in any federal or state judicial administrative proceeding that finds a securities violation by the Debtor on account of his sale of unregistered securities in violation of state or federal securities law, and that such violation "results" in a debt to Herskovic or his defined benefit plan, that debt is excepted from the Debtor's discharge by § 523(a)(19). Moreover, there is nothing preventing Herskovic from requesting that the automatic stay of § 362 be lifted to permit any such proceeding from going forward. Nor is there any reason why Herskovic cannot have this bankruptcy case reopened if he later wishes to have this Court render a determination of non-dischargeability of such debt under § 523(a)(19) and Bankruptcy Rule 4007(b) after such "judgment, order, consent order or decree" is entered. Accordingly, Herskovic's § 523(a)(19) cause of action for a determination of non-dischargeability is dismissed without prejudice.

## IV.  Conclusion

The testimony between these two individuals was conflicting in many instances. Herskovic

was credible, but ill-informed. The Debtor appeared to be generally credible, although there were some instances where the Debtor was not completely candid with Herskovic regarding the nature of the investments or the demise of the investments after they were made. But in the final analysis, the Plaintiffs did not meet their burden of proof to establish a non-dischargeable debt under § 523(a) or to demonstrate an objection to discharge under § 727(a). Accordingly, the Court will render judgment for the Debtor in a separate order consistent with this opinion.

**NOT FOR PUBLICATION**

```
Signed on August 17, 2007
                              /s/ Phillip J. Shefferly
                          Phillip J. Shefferly
                          United States Bankruptcy Judge
```